Louisville Tin and Stove Company v. Commissioner.
Louisville Tin & Stove Co. v. Commissioner
Docket No. 64259.
United States Tax Court
T.C. Memo 1960-103; 1960 Tax Ct. Memo LEXIS 185; 19 T.C.M. (CCH) 551; T.C.M. (RIA) 60103; May 26, 1960
*185 Petitioner made a contribution to a pension fund within 60 days after the end of its fiscal year. Held, this contribution had not accrued during such fiscal year, and it is therefore not deductible under section 23(p)(1)(E) of the I.R.C. of 1939. Ernest Woodward II, Esq., Kentucky Home Life Building, Louisville, Ky., for the petitioner. S. Earl Heilman, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the income and excess profits tax of the Louisville Tin and Stove Company of $75,719.78 for its fiscal year ended November 30, 1953. The sole issue before us is whether a contribution to a pension fund was properly deductible in the taxable year *186 prior to the year in which it was actually paid. Findings of Fact Certain facts were stipulated orally and such facts are so found. Petitioner is a corporation duly organized and existing under the laws of the Commonwealth of Kentucky, with its principal office and place of business in Louisville, Kentucky. Petitioner's income and excess profits tax returns for its fiscal year here in issue, which ended November 30, 1953, were filed with the office of the district director of internal revenue at Louisville, Kentucky. These returns were based on an accrual method of accounting. A pension plan was first considered by petitioner during 1950 or 1951. The minutes of the meetings held by petitioner's board of directors, and dated September 26, November 10, and November 25, 1952, contain the following pertinent material: "Mr. Wrege [president of petitioner] stated he felt pensions would no doubt be brought up next year by the Union and thought it would be a good idea for us to think about setting up a pension fund. "Mr. Wrege was instructed to get information and data and submit to Board for consideration. [From minutes of September 26, 1952.] "Mr. Wrege presented a pension *187 plan as set up by Meidinger & Co. and passed out brochures for study and consideration. [From minutes of November 10, 1952.] "Pension plan was discussed but it was felt we did not have sufficient time to work out a satisfactory plan. Mr. Wrege was instructed to continue working on same. [From minutes of November 25, 1952.]" On Saturday, November 28, 1953, petitioner's president was informed by petitioner's counsel that petitioner had been successful at the trial court level in a patent infringement suit that had been filed against it by the Action Manufacturing Company, Inc., in 1949. Petitioner had feared that an adverse result would be financially crippling and had delayed adoption of any pension plan partly because of such fear. The president was also informed on such date that Acton might appeal and could do so easily and at little expense. A meeting of the petitioner's board of directors was held on Monday, November 30, 1953, for the purpose of discussing the possibility of establishing a pension plan on that date, the last day of petitioner's fiscal year. The minutes of said meeting contain the following: "Mr. Wrege announced a decision had been rendered by Judge *188 Swinford in the Acton suit and that he had ruled for us on all points. "It was felt that inasmuch as we were successful in the Acton case that we should put a pension plan into effect with the result that a contract was drawn up appointing The Citizens Fidelity Bank and Trust Company of Louisville to act as Trustee of pension fund which is to be worked out in detail within 60 days." At said meeting the board considered a document entitled "A Retirement Program for Eligible Employees of Louisville Tin and Stove Company. Calculations to November 30, 1953" which included alternate plans, denominated "Plan #1" and "Plan #2" and providing different retirement income formulas. The document also included alternate cost computations dependent on the presence or absence of employee contribution. The board then resolved, in pertinent part: "BE IT RESOLVED: "That LOUISVILLE TIN AND STOVE COMPANY approve and adopt the Retirement Plan for Eligible Employees evidenced by the agreement (referred to as the "Plan") a copy of which is presented and filed herewith for more particular identification: "That John L. Wrege, President of LOUISVILLE TIN AND STOVE COMPANY, be and he is hereby authorized *189 for and on its behalf to execute all agreements necessary to cause the Plan to be made immediately effective, including the proposed Trust Agreement between LOUISVILLE TIN AND STOVE COMPANY and CITIZENS FIDELITY BANK AND TRUST COMPANY, Louisville, Kentucky, a copy of which is filed with the minutes of this meeting; and "That the President of LOUISVILLE TIN AND STOVE COMPANY be and he is hereby authorized and directed to cause such Plan and Trust Agreement to be submitted to the District Director of Internal Revenue with an application for a ruling that the same meet the requirements of Section 165(a) of the Internal Revenue Code as amended so that the contributions of LOUISVILLE TIN AND STOVE COMPANY will be deductible under the provisions of Section 23(p) of the Code as amended; the President being also authorized to amend said Plan and Trust Agreement in such manner as may be recommended by counsel in order to secure prompt approval thereof by the District Director of Internal Revenue and/or other governmental authority, and also in any other manner which may be approved by counsel for the purpose of correction or clarification of the provisions of the said *190 Plan or Trust Agreement." Also on November 30, 1953, petitioner and the Citizens Fidelity Bank and Trust Company (which is hereinafter referred to as the Trustee) drew up and signed the following agreement: "THIS TRUST AGREEMENT made and entered into this 30th day of November, 1953, by and between Louisville Tin and Stove Company, a corporation organized and existing under the laws of Kentucky (hereinafter called the "Employer"), and Citizens Fidelity Bank and Trust Company, of Louisville, Kentucky (hereinafter called the "Trustee"), "WITNESSETH "1. Employer has this date conveyed and delivered to the Trustee the sum of One Hundred ($100.00) Dollars in cash. The Trustee acknowledges receipt of this sum, to be held in trust and used to provide retirement and other benefits for eligible employees of Employer as set forth in Louisville Tin and Stove Company Retirement Plan for Eligible Employees dated November 30, 1953. "2. This trust agreement may be amended at any time and from time to time by a majority vote of the Board of Directors of Employer, except that no such amendment shall provide that any part of the corpus or income from this fund shall inure to the benefit of *191 any person or persons other than eligible employees of Louisville Tin and Stove Company. "3. Notwithstanding any provisions contained herein, the Trustee shall be authorized to pay any sums to any eligible employees of Employer as authorized in writing by a majority of the Board of Directors of Employer. "4. The Trustee shall invest and reinvest the principal and income of the trust fund in its discretion in such securities, common and preferred stocks, real estate, real estate mortgages and other investments as the Trustee shall believe to be sound and suitable investments for this trust." A check for $100 was actually conveyed and delivered, as mentioned therein. About December 23, 1953, petitioner's counsel wrote petitioner's president, informing him that an agreement had been reached with the plaintiff in the aforementioned patent infringement suit whereby said plaintiff agreed not to appeal the decision in petitioner's favor and petitioner agreed not to collect its court costs in that suit. Petitioner's board again met on January 6, 1954; the minutes are, in part, as follows: "Pension plan was discussed and it was agreed that we take the No. 2 plan on a 2 1/2% basis. *192 * * * It was agreed that funds for past services of employees and pension plan to be paid in this year." On January 18, 1954, petitioner's board of directors agreed to adopt a revised and expanded pension trust agreement and a definite pension plan. Said plan was essentially the same as the tentative plan #2 considered on November 30, 1953, with the alternative of petitioner bearing the entire cost. Petitioner formally announced that it had adopted a pension plan on January 22, 1954, and on that date a detailed description of the plan was furnished petitioner's employees. None of petitioner's employees was notified on or before November 30, 1953, that petitioner had adopted a pension plan. By January 27, 1954, petitioner paid the Trustee $94,463.42 for the first year of its pension plan as calculated under the provisions of the definite plan. [1] The Commissioner has disallowed this payment as a claimed deduction under section 23(p) of the Internal Revenue Code of 1939. At its meeting on February 2, 1954, petitioner's board *193 appointed persons to serve on the Retirement Committee and on the Investment Committee of the plan and trust, respectively. Petitioner submitted to the district director of internal revenue an application for approval of its pension plan on March 2, 1954, and petitioner was notified by a letter dated August 11, 1954, that this application had been approved. During its fiscal year ended November 30, 1953, petitioner had in existence no plan within the purview of section 23(p), Internal Revenue Code of 1939. Opinion Section 23(p), Internal Revenue Code of 1939, provides that if contributions are paid by an employer to or under a pension plan, such contributions "shall not be deductible under subsection (a) [ordinary and necessary business expenses] but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent." [Italics supplied.] Limitations then follow under subparagraphs (A), (B), (C), and (D), each, inter alia, requiring actual payment during the taxable year. There then follows subparagraph (E): "For the purposes of subparagraphs (A), (B), and (C), a taxpayer on the accrual basis *194 shall be deemed to have made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made within sixty days after the close of the taxable year of accrual." Petitioner argues that the statutory phrase "taxable year of accrual" is descriptive and does not mean the year in which the liability accrued but means the year in which the deduction is to be claimed. By this enigmatic language petitioner seems to be arguing that the 60 days of "grace" granted by subsection (E) applies to both payment and accruability. This identical argument has been advanced in other cases, one of which is Abingdon Potteries, Inc., 19 T.C. 23, where we said at page 26: "Since the payment herein was in fact made in 1945, within 60 days after the close of the year 1944, petitioner contends that it is entitled to the reduction in 1944. The difficulty with petitioner's position is that, in our view, the liability for the payment did not in fact accrue in 1944, and that therefore section 23(p)(1)(E) has no application. Section 23(p)(1)(E) deals with payments where there was a proper accrual for the prior year; it allows the deduction to be taken *195 in such prior year, provided that payment is made within 60 days after the close of such year. It in no way undertakes to render an item accruable in the earlier year, which would not otherwise be accruable." To the same effect, see Barrett Timber & Dunnage Corporation, 29 T.C. 76. We are of the opinion that the statement made in the Abingdon Potteries case is correct and on the authority of such case we resolve this point against petitioner. Petitioner next argues that by November 30, 1953, the last day of its fiscal year, it did have in existence a sufficient pension plan within the requirements of section 23(p) to entitle it to accrue the payment here in question on such date and that since such payment was in fact made within 60 days thereafter, it is deductible in petitioner's fiscal year ended November 30, 1953. Thus the question for our decision is whether petitioner had such a plan in existence on November 30, 1953. We have concluded from the entire record that petitioner had no such plan in existence during its fiscal 1953. The factors which we considered were, among others, that two sample or proposed plans, each with alternate provisions, were considered *196 by petitioner on the last day of its fiscal year but decision was not in fact made until January 18, 1954. Petitioner's position on November 30, 1953, is aptly expressed by its president on cross-examination as follows: "Q. * * * Is it true or not that the board of directors approved the contract as such on [November 30, 1953]? "A. Not the contract as was adopted because we didn't know just exactly what the thing was going to cost us, how much we would have the employees stand, and how much the company would pay, and just how much pension we would pay. We wanted to give the matter some consideration first. "Q. What is it that they approved, then, on November 30? "A. That we would set up a pension plan. "Q. But you approved no specific contract? "A. That's right. We had these two under consideration and we knew that we were going to accept one or the other of them. At least, we felt we were." We observe in this connection that petitioner had been delaying the inauguration of a pension plan because of the Action litigation and petitioner knew on November 30, 1953, that such litigation was not yet finally terminated. It was not so terminated until about December 23, 1953, and *197 petitioner's plan was not finally adopted until January 18, 1954. This circumstance gives special meaning to the statement of petitioner's president that on November 30, 1953, petitioner knew it was going to accept "one or the other of them. At least, we felt we were." (Italics supplied.) No announcement of the plan was made to petitioner's employees until January 22, 1954. Personnel of the Retirement Committee and of the Investment Committee under the plan were not designated until February 2, 1954. Perhaps none of these factors standing alone would be sufficient to rule out the existence of petitioner's plan during its fiscal 1953, but the sum total of all of them leads us unescapably to that conclusion, and it is not altered by what we regard as a mere token payment of $100 on November 30, 1953. A liability is not incurred for tax purposes within the taxable year unless all the events which fix the amount of the liability and the obligation of the taxpayer to pay it occurred in that year. United States v. Anderson, 269 U.S. 422. Since petitioner had no plan in existence during its fiscal year ended November 30, 1953, it could not and did not incur and may not accrue *198 any liability during such year. Decision will be entered for the respondent. Footnotes
1. This was apparently in addition to the $100 paid on November 30, 1953 for petitioner states on brief that its deduction of said $100 was allowed.↩